**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**KIMBERLY STARLING**, *on behalf of herself and others similarly situated,*

*Plaintiff,*

v.

**COVERAGE ONE INSURANCE GROUP, LLC and DAVID ETTINGER**,

*Defendant*.

Case No.: **0:26-cv-60134-MD**

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## Nature of this Action

1. This action arises out of Defendant, Coverage One Insurance Group, LLC's ("Coverage One" or "Defendant") illegal telemarketing practices that violate the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA").

2. Coverage One is a health insurance agency offering Medicare Advantage and Medicare supplement insurance.

3. David Ettinger ("Ettinger") is the owner of Coverage One.

4. Coverage One solicits new customers via illegal cold calling campaigns.

5. Coverage One knows its campaigns are illegal and attempts to conceal its illegal conduct by using fake company names during the initial portions of calls, such as the "Medicare Health Center," so that consumers will have difficulty identifying Coverage One as the source of the calls.

6. Coverage One continues making these calls even when the called party requests not to be called again.

7. Coverage One does not obtain consent for these calls, and upon information and belief, purchases lead lists or other consumer data for its cold calling campaigns.

8. Many of Coverage One's calls were/are made to individuals who have registered their telephone numbers on the National Do-Not-Call Registry – because they did not want to receive any type of telemarketing calls.

9. The TCPA prohibits making telemarketing calls to individuals who have registered their telephone numbers on the National Do-Not-Call Registry.

10. The TCPA also prohibits falsely identifying the entity making the call and on whose behalf a telemarketing call is being made.

11. Accordingly, Plaintiff Kimberly Starling ("Plaintiff" or "Ms. Starling") brings this action on behalf of herself and classes of similarly situated individuals.

## Jurisdiction and Venue

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the TCPA, which is a federal statute.

13. This Court has jurisdiction over Coverage One because Coverage One is headquartered in this District, conducts business transactions in this District and transmits calls from this District as part of the business it conducts in this District.

14. The Court has jurisdiction over Ettinger because Ettinger resided in this District, conducts business transactions in this District and transmitted calls from this District as part of the business he conducts in this District.

15. Venue is proper in this District because a substantial part of the events or omissions giving rise to Ms. Starling's claims occurred in this District.

16. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a), because they are so closely related to the federal claims that they form a single case or controversy.

## Parties

17. Plaintiff Kimberly Starling is a natural person who at all relevant times resided in Southlake, Texas.

18. Ms. Starling is, and at all relevant times was, a "person" as defined by 47 U.S.C. § 153(39).

19. Coverage One is a limited liability company organized and existing under the laws of the State of Florida, with headquarters located at 20087 Waters Edge Drive, Suite 205, Fort Lauderdale, Florida 33488.

20. Coverage One is, and at all relevant times was, a "person" as defined by 47 U.S.C. § 153(39).

21. Ettinger is an individual living in Florida. Ettinger is, and at all relevant times was, a "person" as defined by 47 U.S.C. § 153(39).

22. Ettinger is the President of Coverage One and is responsible for its daily operations, company strategies and performance.

## TCPA Background

23. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy[,]" and found that federal legislation was needed because "telemarketers [could] evade [state-law] prohibitions through interstate operations.'" *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (citations omitted).

24. Relevant here, the TCPA establishes a national "do not call" database of numbers not to be called. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 ("DNC Order").

25. These regulations are codified at 47 C.F.R. §§ 64.1200(e)(1-2).

26. Specifically, a company may not initiate any "telephone solicitation" to a telephone subscriber "who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2).

27. A violation of 47 C.F.R. § 64.1200(c) carries statutory damages of $500 to $1,500 per call through § 227(c) of the TCPA.

28. The TCPA also specifically required the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

29. The FCC was instructed to "compare and evaluate alternative methods and procedures (including the use of … company-specific do not call systems …)" and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." *Id.*

30. These regulations are codified at 47 C.F.R. § 64.1200(d)(1)-(7).

31. These regulations require a company to keep a written policy, available upon demand, for maintaining a do-not-call list, train personnel engaged in telemarketing on the existence and use of its internal do-not-call list, and record and honor "do not call" requests for no less than five years from the time the request is made. 47 C.F.R. § 64.1200(d) (1, 2, 3, 6).

32. These regulations also require persons or entities making telemarketing calls to accurately provide "the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted." 47 C.F.R. § 64.1200(d)(4).

33. These policies and procedures prohibit a company from making calls for telemarketing purposes[1] unless they have implemented these policies and procedures. 47 C.F.R. § 64.1200(d).

34. Accordingly, all telemarketing calls violate the TCPA, unless Defendant can demonstrate that it has implemented the required policies and procedures.

35. There is a private right of action to enforce 47 C.F.R. § 64.1200(d) through § 227(c):

> Section 227(c)(5)… empowers 'any person' to sue for damages and injunctive relief for do-not-call violations 'by or on behalf of' a company. In accordance with this statutory provision, the Commission's company-specific do-not-call rules provide that '[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity[.]' 47 C.F.R. § 64.1200(d).

*In re Dish Network*, 28 FCC. Rcd. 6574, ¶ 29 (2013)

36. These requirements are separate but cumulative. In other words, a company must comply with both the 64.1200(d) regulations *and* the procedures for complying with the national "do not call" database regulations. A failure to comply with either is distinct a violation of 47 U.S.C. § 227(c).

---

[1] The distinction between the use of "telephone solicitation" in relation to the national do-not-call database and calls for "telemarketing purposes" in relation to the company-specific do-not-call list is significant. "Telephone solicitation" excludes calls made to a person with whom the company has as established business relationship, 47 CFR 64.1200(f)(14), which can be established by a "voluntary two-way communication". 47 CFR 64.1200(f)(5). But this business relationship can be terminated by a "do not call" request. 47 CFR 64.1200(f)(5)(i). "Telemarketing purposes", on the other hand, includes any calls made for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, regardless of any consent or established business relationship. 47 CFR 64.1200(f)(12). In other words, prior to making any telemarketing calls to anyone, regardless of relationship, a company must implement the company-specific do-not-call regulations, but it only needs to comply with the national do-not-call registry provisions with respect to persons with whom it does not have an existing established business relationship.

37. Further, a person or entity can be liable for calls made on its behalf in violation of the TCPA, even if that person or entity did not directly dial such calls. *See, e.g., In re Rules & Regs. Implementing the TCPA*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995) (explaining that the FCC's "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any [TCPA] violations"). In fact, in May 2013, the FCC issued a binding declaratory ruling clarifying that sellers "may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers . . . under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd. 6574, 6584 ¶28 (2013).

38. Accordingly, an entity can be liable under the TCPA for a prohibited call made on its behalf under a number of theories including vicarious liability. Under those circumstances, the seller is properly deemed to have initiated the call through the person or entity that actually placed the call.

**Texas Business & Commerce Code Background**

39. Section 302.101 of the Texas Business & Commerce Code prohibits sellers from engaging in telephone solicitation from a location in Texas or to a purchaser located in Texas unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

40. Sellers engaging in telephone solicitations are required to register, and among other things, list "each telephone number to be used by the seller and the address where each telephone using the number is located." §302.151(10).

41. Section 302.302(a) of the Texas Business & Commerce Code provides that a person

who violates this chapter is subject to a civil penalty of no more than $5,000 for each violation. Furthermore, section 302.302(d) provides that the party bringing the action is also entitled to recover all reasonable cost of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorneys' fees.

42. Pursuant to section 305.053(a) of the Texas Business & Commerce Code, a person who receives a communication that violates 47 U.S.C. § 227, or a regulation adopted under that provision, may bring an action against the person who originates the communication for an injunction, damages or both.

**Factual Allegations**

43. Ms. Starling is the user of her residential telephone number (817)-XXX-5727.[2]

44. Ms. Starling's telephone number (817)-XXX-5727 is used for residential purposes and is not associated with a business.

45. Ms. Starling's telephone number has a Texas area code.

46. Ms. Starling's telephone number (817)-XXX-5727 has been on the National Do-Not-Call Registry since May 24, 2021.

47. Ms. Starling placed her telephone number (817)-XXX-5727 on the National Do-Not-Call Registry because she did not want unsolicited telemarketing calls, such as the ones at issue here.

48. On or about January 26, 2022, Ms. Starling began receiving telephone calls from Coverage One. Each of the calls was received by Ms. Starling while she was in Texas.

49. The calls were made by Coverage One.

[2]. Ms. Starling is not providing her full telephone number in this Complaint, a public document, to prevent further misuse and dissemination of her number. Ms. Starling's full telephone number will be provided to counsel for Defendants in discovery.

50. The calls were placed by a Coverage One screener that would use fake company names in an attempt to conceal the illegal conduct and prevent the calls from being traced back to Coverage One.

51. The Coverage One screener would attempt to collect certain information about the caller to determine if the caller fit within certain criteria or demographics that would make the called party eligible to purchase products sold by Coverage One.

52. Coverage One used a screener because the calls were cold calls and Coverage One would need to gather information about the caller, because Coverage One did not know that information before placing the calls. Alternatively, to the extent Coverage One was calling a "lead" (i.e., a name and telephone number) it purchased from a third-party data provider, Coverage One would gather information about the called party to confirm that the lead information was accurate before passing the called party to the next step. [3]

53. Once the Coverage One screener determined that the called party was eligible to purchase products offered by Coverage One, the Coverage One screener would transfer the call to a Coverage One closer, who was a Florida-licensed insurance agent that could sell the insurance products at issue.

54. Coverage One physically placed the calls at issue in this case to Ms. Starling's telephone number (817)-XXX-5727.

55. Alternatively, the act of physically placing the calls to Ms. Starling was done by

---

[3] Indeed, Coverage One has been sued by certain of its lead providers for non-payment of fees associated with the provision of leads (i.e., names and phone numbers) to Coverage One. *See, e.g., Innovation Direct Group, LLC v. Coverage One Insurance Group, LLC*, Case No. CACE-22-005604, Complaint (Fla. Broward Cty. Ct. Apr. 19, 2022). In that action, Coverage One's lead vendor states "Defendant conducts . . . marketing, at least in part, through direct telephone solicitations to potential customers of its insurance products. Defendant makes, causes to be made, or relies upon thousands of such solicitation calls every year." *Id.* at ¶ 5.

one of Coverage One's authorized third-party agents at Coverage One's direction and control.

*The January 26, 2022 Call at 2:19 p.m. from (319) 348-2758*

56. The first call Ms. Starling received from Coverage One occurred on January 26, 2022 at 2:19 p.m. and came from (319) 348-2758.[4]

57. The purpose of the call was to screen Ms. Starling and transfer her to a Coverage One "closer" so that Coverage One could solicit her with its products and services.

58. Prior to this call, Ms. Starling had no business relationship with Coverage One.

59. Prior to this call, Ms. Starling never directly contacted Coverage One.

60. Prior to this call, Ms. Starling never placed a call to Coverage One.

61. Prior to this call, Ms. Starling had never heard of Coverage One.

62. During the first call, Coverage One's telemarketer identified himself as "Greg" and stated he was calling from the "Medicare Health Center."

63. This was false.

64. Greg was calling from Coverage One.

65. Greg asked if Ms. Starling was located in the state of Texas.

66. Greg asked for Ms. Starling's zip code.

67. Greg asked for Ms. Starling's name.

68. Greg asked for all of this information because he did not have it and because the call was a cold call.

69. Greg claimed that Ms. Starling was qualified to obtain certain benefits from Medicare.

[4] Upon information and belief, the telephone number that appeared on Ms. Starling's caller ID was a "spoofed" number used by Coverage One to conceal the identity of the caller. Using misleading or inaccurate caller identification information is also a violation of the TCPA. *See* 47 U.S.C. § 227(e).

70. Greg attempted to transfer the call to Coverage One's "closer" but one of Coverage One's closers was not available and the call was terminated.

*The January 26, 2022 Call at 3:06 p.m. from (501) 290-4380*

71. The second call Ms. Starling received from Coverage One occurred on January 26, 2022 at 3:06 p.m. and came from (501) 290-4380.[5]

72. The purpose of the call was to screen Ms. Starling and transfer her to a Coverage One "closer" so that Coverage One could solicit her with its products and services.

73. During this call, Coverage One's telemarketer identified himself as "Michael" and stated he was calling from the "Medicare Health Center."

74. Ms. Starling asked why Michael was calling.

75. Michael advised that the call was about Medicare Advantage plans for 2022.

76. Michael attempted to screen Ms. Starling to see if she was eligible to purchase products from Coverage One.

77. Ms. Starling engaged with the caller in an attempt to determine what company the caller was actually calling from.

78. Michael then attempted to connect the call to a Coverage One "closer" but the call would not connect and Michael advised that the "licensed agent" was busy and unavailable.

79. Michael asked if he could call back tomorrow.

80. Ms. Starling stated that she was not interested and instructed Michael to stop calling.

*The January 27, 2022 Call at 11:01 a.m. from (254) 324-4667*

81. The third call Ms. Starling received from Coverage One occurred on January 27,

[5] Upon information and belief, the telephone number that appeared on Ms. Starling's caller ID was a "spoofed" number used by Coverage One

2022 at 11:01 a.m. and came from (254) 324-4667. [6]

82. The purpose of the call was to screen Ms. Starling and transfer her to a Coverage One "closer" so that Coverage One could solicit her with its products and services.

83. During this call, Coverage One's telemarketer stated he was calling from the "Medicare Health Center."

84. In response, Ms. Starling stated "Stop calling me. I'm not interested."

85. Ms. Starling then terminated the call.

*The January 31, 2022 Call at 3:54 p.m. from (254) 324-4660*

86. The fourth call Ms. Starling received from Coverage One occurred on January 31, 2022 at 3:54 p.m. and came from (254) 324-4660. [7]

87. The purpose of the call was to screen Ms. Starling and transfer her to a Coverage One "closer" so that Coverage One could solicit her with its products and services.

88. During this call, Coverage One's telemarketer stated he was calling from the "Medicare Health Center."

89. The caller asked Ms. Starling for her zip code.

90. The caller asked Ms. Starling if she had her "red, blue and white card available."

91. Ms. Starling engaged with the caller in an attempt to determine what company the caller was actually calling from.

92. The caller asked Ms. Starling to stay on the line so he could transfer the call.

93. The caller then attempted to transfer the call.

94. The caller could not transfer the call and advised that the licensed agent was busy

[6] Upon information and belief, the telephone number that appeared on Ms. Starling's caller ID was a "spoofed" number used by Coverage One

[7] Upon information and belief, the telephone number that appeared on Ms. Starling's caller ID was a "spoofed" number used by Coverage One

at the moment.

95. The caller asked if he could call back tomorrow.

96. Ms. Starling said no and advised that she was not interested.

*The January 31, 2022 Call at 5:04 p.m. from (409) 232-5523*

97. The fifth call Ms. Starling received from Coverage One occurred on January 31, 2022 at 5:04 p.m. and came from (409) 232-5523. [8]

98. The purpose of the call was to screen Ms. Starling and transfer her to a Coverage One "closer" so that Coverage One could solicit her with its products and services.

99. During this call, Coverage One's telemarketer stated his name was Michael and that he was calling from the "Medicare Health Center."

100. Ms. Starling engaged with the caller in an attempt to determine what company the caller was actually calling from.

101. The caller asked Ms. Starling for her zip code.

102. The caller asked Ms. Starling for her date of birth to determine if she qualified for benefits.

103. The caller asked Ms. Starling if she makes her own decisions.

104. The caller asked Ms. Starling to confirm she was in Texas.

105. The caller asked Ms. Starling if she had any medical issues, like high blood pressure.

106. The caller asked Ms. Starling how to correctly pronounce her name.

107. The caller stated he was going to transfer the call to a licensed agent.

108. The caller attempted to transfer the call.

[8] Upon information and belief, the telephone number that appeared on Ms. Starling's caller ID was a "spoofed" number used by Coverage One

109. Ms. Starling remained on hold, but Coverage One's closer never answered this call and she terminated the call.

*The February 1, 2022 Call at 9:09 a.m. from Unknown Number*

110. The sixth call Ms. Starling received from Coverage One occurred on February 1, 2022 at 9:09 a.m. and came from an "unknown number".

111. The purpose of the call was to screen Ms. Starling and transfer her to a Coverage One "closer" so that Coverage One could solicit her with its products and services.

112. During this call, Coverage One's telemarketer asked if he was speaking with "Starling, Kim."

113. Ms. Starling asked who was calling.

114. The caller stated his name was Mike and that he was calling from the "Medicare Health Center."

115. He stated that he spoke with her yesterday and that the licensed agent was busy and not free and that is why he was calling back.

116. The caller then asked for qualifying information.

117. He asked how old Ms. Starling was and asked her to confirm her date of birth.

118. He asked Ms. Starling to confirm her zip code and that she was still living in Texas.

119. He said that he was going to transfer the call to his "senior associate".

120. The call was then transferred to Nadine Roper, a licensed insurance agent with Coverage One.

121. Ms. Roper began to solicit Ms. Starling with Coverage One's products and services.

122. Ms. Roper read Ms. Starling a "verbal scope of appointment on a recorded line" as required by CMS to discuss products and services with her.

123. Ms. Starling asked Ms. Roper what company she was with.

124. She confirmed that she was with Coverage One located in Florida.

125. Ms. Starling asked for the website for Coverage One.

126. Ms. Roper stated the website was coverageone.com.

127. Ms. Starling asked Ms. Roper what her direct telephone number was.

128. Ms. Roper than provided her direct number to Ms. Starling: "888-288-6302."

129. Ms. Starling then terminated the call.

130. Each of the above calls was part of a single, coordinated telemarketing campaign implemented by Coverage One and Ettinger designed to conceal their illegal conduct. This is evidenced by (1) the consistent scripts used by the screeners, a script that Coverage One and Ettinger approved, (2) the single, fake company name used by the screeners, (3) the single consistent pattern of transferring or attempting to transfer the call to a Coverage One agent/closer after certain verifying information was obtained during the screening portion of the call, and (4) the screener on the sixth call knew Starling's name and said he had called her the day before [the fifth call received by Starling from Coverage One]. Defendants admit in their Court ordered TCPA disclosures that third parties may have placed the calls to Plaintiff. Defendants admit that Data Giant, LLC ("Data Giant") may have information about the equipment used to make the calls. Defendants allege that Plaintiff may have given consent to receive the calls. Defendants state that third-parties, including Verisk Marketing Solutions and/or ActiveProspect may have information about the alleged consent. Defendants would not know this information unless Defendants were responsible for each of the calls and each of the calls was made on their behalf.

131. Additionally, Defendants' Court ordered TCPA disclosures are deficient and Defendants are intentionally concealing information. This is a further indication that Defendants

are responsible for each of the calls and each of the calls were made on Defendants' behalf.

132. To the extent Defendants used Data Giant (to make the initial screening calls, upon information and belief, Data Giant was the functional equivalent of a "branch" of Coverage One.

133. Upon information and belief, Data Giant was a "shell company" used by Coverage One to employ overseas telemarketers to be used exclusively by Coverage One to place screening calls *en masse.*

134. Upon information and belief, Data Giant was Coverage One's agent and was contracted with Coverage One to place the calls on behalf of Coverage One.

135. Upon information and belief, Data Giant and Coverage One shared common executives.

136. Upon information and belief, Coverage One's Chief Information Officer was also Data Giant's founder.

137. Upon information and belief, this executive took direction directly from, and reported directly to Ettinger.

138. Ms. Starling did not provide prior express invitation or permission or consent for any of Coverage One's telephone calls.

139. Coverage One did not have the required policies or procedures at the time of the calls it made to Ms. Starling and the classes defined below.

140. Alternatively, whatever written policies existed either failed to comply with the minimum requirements under the TCPA, 47 C.F.R. § 64.1200(d), or were never properly implemented—including as evidenced by the use of false and deceptive identification during the telephone calls to Ms. Starling.

141. Coverage One's violations were negligent.

142. Alternatively, Coverage One's violations were willful and knowing.

143. Ms. Starling and the classes were damaged by the violations alleged herein. Their privacy was improperly invaded, Coverage One's calls seized and trespassed upon the use of their phones, and/or they were forced to divert attention away from other activities to address the unwanted telephone calls. Coverage One's telephone calls were annoying and a nuisance, and wasted the time of Ms. Starling and the class members. *See, e.g., Mims,* 565 U.S. at 372 (discussing congressional findings of consumer "outrage" as to prerecorded calls).

**DEFENDANT'S LIABILITY**

144. Because Coverage One's calls constitute "solicitations" and "telemarketing" as defined by the regulations to the TCPA, Coverage One was required to obtain prior express written consent from the persons to whom Coverage One made calls.

145. "Prior express written consent" is specifically defined by statute as:

> [A]n agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

47 C.F.R. §64.1200(f)(8)

146. Ms. Starling never provided Coverage One with any consent written or otherwise.

147. Coverage One was engaged in a cold calling campaign without any consent.

148. Coverage One used automated systems to make unsolicited outbound telephonic sales calls to hundreds if not thousands of consumers across the U.S., including to consumers whose phone numbers are listed on the National Do-Not Call Registry.

149. All of the calls alleged herein were made to Plaintiff and Class members for the

purpose of selling Coverage One's insurance products and services to them.

150. Coverage One made two or more telephone solicitations to Ms. Starling, whose number was on the National Do-Not-Call Registry at the time of the telephone calls. This constitutes a violation of 47 U.S.C. § 227(c) through 47 C.F.R. § 64.1200(c).

151. Accordingly, for violations of 47 C.F.R. § 64.1200(c), Ms. Starling is entitled to $500 per call through 47 U.S.C. § 227(c).

152. Ms. Starling is entitled to $1,500 per call if the actions are found to be knowing or willful.

153. Coverage One placed two or more telemarketing calls to Ms. Starling, despite not having in place the required policies and procedures prior to making such calls. This constitutes a violation of 47 U.S.C. § 227(c) through 47 C.F.R. § 64.6200(d).

154. Coverage One's lack of policies and procedures is evidenced by its use of its faulty identification practices, for example by falsely claiming it was "Medicare Health Center" calling Ms. Starling. The lack of policies is also evidenced by the fact that Starling asked not to be called anymore, yet she continued to receive calls from the Coverage One screeners despite her do-not-call request.

155. Accordingly, for violations of 47 C.F.R. § 64.1200(d), Ms. Starling is entitled to $500 per call through 47 U.S.C. § 227(c).

156. Ms. Starling is entitled to $1,500 per call if the actions are found to be knowing or willful.

## DIRECT LIABILITY

157. Coverage One directly initiated the unlawful telemarketing calls to Plaintiff and Class members and is directly liable for violating the TCPA.

158. Coverage One utilized "screeners" to place the initial calls to efficiently identify potential leads that were eligible to purchase the products and services Coverage One was selling.

159. Once Coverage One's screeners identified a qualified lead, they would transfer the call to a Coverage One "closer" that could sell Coverage One's products and services.

160. The screeners also used Coverage One's computers system and entered information about the qualified lead into the computer system.

161. The screeners were directly controlled by Coverage One, used scripts provided by and/or approved by Coverage One, and were operating in accordance with instructions provided directly by Coverage One. For example, Coverage One set the criteria or information required to be obtained before the screeners were to transfer the call to a Coverage One licensed insurance agent. Coverage One provided the screeners with instructions on how to transfer the calls, and the numbers of the agents to transfer the calls.

162. Coverage One initiated and made the calls to Ms. Starling and class members, so Coverage One is directly liable for their transmission to Plaintiff and Class members.

## ACTUAL AUTHORITY

163. The TCPA incorporates federal common law agency principles.

164. To the extent Coverage One outsources the act of executing the unlawful calls to third parties, such as Data Giant, such an act would not and does not absolve Coverage One from liability under the TCPA.

165. To the extent Coverage One outsourced the act of executing the unlawful calls to a third party, and to the extent third party is a distinct legal entity from Coverage One, such an act would not and does not absolve Coverage One from liability under the TCPA.

166. To the extent a third party physically placed the calls, Coverage One specified and

directed that third party who to call and provided that third party with scripts and instructions and instructed the third party on how to execute the calling campaign on its behalf, including what information to acquire and what number to transfer calls to after qualifying the called party. To the extent a third party physically placed the calls, Coverage One authorized that third party--expressly or impliedly--to execute the unlawful calls to Ms. Starling and Class members.

167. To the extent a third party physically placed the calls, Coverage One allowed the third party representatives to enter information about the called party into Coverage One's systems so that the licensed agent / closer could access that information during the call transfer.

168. To the extent a third party physically placed the calls, Coverage One set the criteria or information required to be obtained before the screeners were to transfer the call to a Coverage One licensed insurance agent. Coverage One provided the screeners with instructions on how to transfer the calls, and the numbers of the agents to transfer the calls.

169. During all relevant times, Coverage One knew that the third party was engaged in marketing practices constituting unlawful calling to direct consumers to Coverage One's closers and/or licensed insurance agents, in accordance with the specifications and contractual provisions agreed to by Coverage One.

170. To the extent Coverage One used Data Giant to place the initial screening calls, Data Giant was effectively a "branch" of Coverage One that was controlled by common executives of Coverage One.

171. Coverage One accepted, did not object to, and benefitted from the third party's violations of the TCPA.

172. Coverage One directed and controlled the conduct of the third party by, *inter alia*, instructing and closely controlling the content of the calls and contacts with Plaintiff and other call

recipients, controlling and monitoring the direction, and manner of their conduct on behalf of Coverage One, establishing and enforcing guidelines and specifications of the third party's activities on behalf of Coverage One, retaining rights to modify, amend, or withdraw the third party's authority to act on behalf of Coverage One in making the unlawful calls, compensating the third party for engaging in conduct that violated the TCPA, knowing that third party engaged in conduct that violated the TCPA or instructing them, impliedly or expressly, not to disclose information that, if known by Coverage One, would establish their knowledge that the third party was engaged in conduct violating the TCPA.

173. Due to the private nature of the systems Coverage One and any third party used for the outbound telephone calls, Plaintiff has no access to information to identify the exact relationship between Coverage One and any third party, who are the anonymous public facing arm of Coverage One's unlawful calling scheme.

174. However, Plaintiff is not required to know this information at the pleading stage. *Dish Network* states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." 28 F.C.C. Rcd., at 6592–93 (¶ 46).

**APPARENT AUTHORITY**

175. *Dish Network* further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the [third party] access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller

> approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 FCC Rcd. at 6592 (¶ 46).

176. To the extent a third party physically placed the calls, Coverage One allowed the third party to enter consumer information into its systems.

177. To the extent a third party physically placed the calls, Coverage One provided the third party with the tools to do so.

178. To the extent a third party physically placed the calls, that third party did not independently identify itself to Plaintiff and the other Class members or provide their contact information as required by law. Rather, such third-party and/or Coverage One masqueraded as other fictitious companies and used false caller ID information to conceal their illegal activity.

## RATIFICATION

179. To the extent a third party physically placed the calls, Coverage One knowingly and actively accepted business and contacts with consumers that originated through TCPA-violating calls.

180. To the extent a third party physically placed the calls, Coverage One ratified the TCPA violations by knowingly accepting the benefit of new contacts with consumers despite the fact that these consumers were generated through conduct that violates the TCPA.

181. For example, Ms. Starling expressed to Ms. Roper that the call came from a random person with a heavy accent.

182. Ms. Roper did not object to the call transfer in any way.

183. Alternatively, to the extent a third party physically placed the calls, Coverage One ratified the TCPA violations by knowing facts that would cause an ordinarily prudent person to inquire as to whether the third party was complying with the TCPA, or create reasonable suspicion that the third party does not comply with the TCPA, willfully turning a blind eye to those facts, and accepting the benefit of new consumer contacts despite the fact that they were generated through conduct that violates the TCPA.

184. To the extent a third party physically placed the calls, Coverage One ratified the TCPA violations of the third party by being willfully ignorant of the violations or by being aware that such knowledge was lacking and accepting the benefits of the TCPA violations.

185. **INDIVIDUAL LIABILITY OF ETTINGER BECAUSE OF HIS PERSONAL PARTICIPATION, DIRECTION, AND KNOWING CONDUCT**

186. Individuals acting on behalf of a corporation may be held personally liable for violations of the TCPA if they "had direct, personal participation in or personally authorized the conduct found to have violated the statute." *Texas v. Am. Blastfax, Inc.,* 164 F.Supp.2d 892, 898 (W.D.Tex. 2001)("[A]n officer may be personally liable under the TCPA if he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved. Individuals who directly (and here, knowingly and willfully) violate the TCPA should not escape liability solely because they are corporate officers.").

187. A number of other federal district courts have concluded that individuals acting on behalf of a corporation may be held personally liable under the TCPA when they directly participated in, or personally authorized, the violative conduct. *See City Select Auto Sales Inc. v. David Randall Assocs., Inc.*, 885 F.3d 154, 161 (3rd Cir. 2018)*; Bais Yaakov of Spring Valley v. Graduation Source, LLC*, No. 14-CV-3232 (NSR), 2016 WL 1271693, at *5 (S.D.N.Y. Mar. 29,

2016); *Sandusky Wellness Ctr., LLC v. Wagner Wellness, Inc.*, No. 3:12 CV 2257, 2014 WL 1333472, at *3 (N.D. Ohio Mar. 28, 2014); *Maryland v. Universal Elections,* 787 F. Supp. 2d 408, 416 (D.Md. 2011)(reasoning that "if an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force"); *Baltimore-Washington Tel. Co. v. Hot Leads Co., LLC*, 584 F. Supp. 2d 736, 745 (D. Md. 2008).

188. At all relevant times, Defendant Ettinger was the founder, owner, and President of Coverage One.

189. Ettinger exercised substantial control over Coverage One's operations, including its telemarketing practices, lead generation activities, vendor relationships, and compliance policies.

190. Ettinger is not a passive owner. He personally makes decisions on behalf of Coverage One and directs the company's business activities.

191. Coverage One is primarily owned and controlled by Ettinger and his wife, and Ettinger maintains final decision-making authority over the company's operations.

192. Coverage One operates as a telephonic insurance sales business that relies on inbound and outbound telephone communications to generate leads and sell insurance products.

193. Ettinger personally participated in and directed Coverage One's telemarketing and lead-generation activities.

194. Specifically, Ettinger was involved in sourcing and approving lead-generation channels used by Coverage One with the assistance of other Coverage One executives that reported directly to him.

195. Decisions regarding lead sourcing and marketing vendors were made by Ettinger in conjunction with other executives at Coverage One.

196. Ettinger personally approved Coverage One's use of "screeners" to place calls on behalf of Coverage One.

197. The calls made by screeners were made on behalf of Coverage One and for Coverage One's benefit.

198. Coverage One funded and controlled the telemarketing campaign, including directly or indirectly paying the screeners.

199. Ettinger personally participated in launching and overseeing the telemarketing campaigns at issue in this case and maintained final approval over the other executives' actions that were involved with the telemarketing operation.

200. Ettinger attended and participated in meetings regarding the structure, implementation, and execution of these campaigns.

201. These meetings included discussions regarding how leads would be generated, how calls would be placed, and how consumers would be screened and transferred.

202. Ettinger was aware that Coverage One's campaigns involved the use of screeners who would initially contact consumers and then transfer calls to Coverage One agents.

203. Coverage One agents would then attempt to sell insurance products to those consumers.

204. The use of screeners was an integral part of the campaign structure approved and implemented by Ettinger.

205. Ettinger also approved and participated in decisions regarding the geographic targeting of consumers and the sourcing of consumer data used in the campaigns.

206. The telemarketing campaigns were designed to generate leads and sales for Coverage One, and Coverage One profited from these activities.

207. Ettinger had prior knowledge of TCPA-related issues and risks associated with telemarketing.

208. Prior to and during the conduct at issue, Coverage One had received TCPA demand letters and claims relating to its telemarketing practices.

209. Ettinger personally handled or was involved in responding to such TCPA-related claims and communications.

210. Despite this knowledge, Ettinger continued to authorize and direct telemarketing campaigns that utilized screeners, lead lists, and transfer-based sales practices.

211. Coverage One, under Ettinger's direction, did not implement or enforce adequate policies and procedures to ensure compliance with the TCPA.

212. Coverage One, under Ettinger's direction, failed to maintain and enforce a lawful internal do-not-call policy.

213. Coverage One, under Ettinger's direction, failed to properly train personnel and agents regarding TCPA compliance requirements.

214. Coverage One, under Ettinger's direction, continued to place calls without obtaining prior express consent and continued to call individuals who had requested not to be called.

215. Coverage One, under Ettinger's direction, used misleading or false identifiers—such as fictitious business names—during the initial portions of calls in order to conceal Coverage One's identity.

216. The unlawful telemarketing practices alleged herein—including the use of screeners, failure to obtain consent, failure to honor do-not-call requests, and use of misleading caller identification—were not isolated or accidental.

217. Rather, these practices were the foreseeable and intended result of the telemarketing system designed, approved, and implemented by Ettinger.

218. Ettinger directly participated in, authorized, and ratified the conduct that gives rise to Plaintiff's claims. He designed, approved and implemented the calling/marketing campaign that resulted in the calls to Plaintiff and the putative Class Members.

219. Ettinger's conduct was knowing and willful, or, at a minimum, constituted a gross failure to implement appropriate policies and procedures to ensure compliance with the TCPA.

220. Accordingly, Ettinger is personally liable for the TCPA violations alleged herein.

## CLASS ACTION ALLEGATIONS

221. Ms. Starling brings this action under Fed. R. Civ. P. 23 on behalf of three proposed "Classes," as defined as follows:

### THE CLASSES

> Plaintiff and all persons within the United States to whose telephone number Coverage One (or its agent) placed two or more telemarketing calls in a 12-month period when the telephone number to which the telephone calls were made was on the National Do-Not-Call Registry for more than 30 days at the time of the calls, and where the purpose of the telemarketing calls was to solicit Medicare related insurance products, from four (4) years prior to the filing of the Complaint.

("Registry Class")

> Plaintiff and all persons within the United States whose telephone number Coverage One (or its agent) placed two or more telemarketing calls in a 12-month period from four (4) years prior to the filing of the Complaint that stated the call was on behalf of the "Medicare Health Center."

("Policy Class").

> Plaintiff and all persons in the state of Texas to whom after four years preceding the filing of this Complaint Coverage One (or its agent) made two or more telemarketing calls in a 12-month period in violation of 47 U.S.C. § 227 or a regulation adopted under that provision.

(Texas Class)

> Since four years preceding the filing of this Complaint, through the date of certification, Plaintiff and all residents of the State of Texas to whose telephone number Defendant placed (or had placed on its behalf) a telephone solicitation when Defendant did not hold a registration certificate as required by Tex. Bus. & Com. Code § 302.101.

(Texas Registration Class)

(The Registry Class, the Policy Class, the Texas Class and the Texas Registration Class are collectively referred to herein as the "Classes.")

222. Excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest; Defendant's agents and employees; any Judge and Magistrate Judge to whom this action is assigned and any member of their staffs and immediate families, and any claims for personal injury, wrongful death, and/or emotional distress.

223. The Members of the Classes for whose benefit this action is brought are so numerous that joinder of all members is impracticable.

224. The exact number and identities of the persons who fit within the Classes are ascertainable in that Defendant and third parties maintain written and electronically stored data showing:

- The time period(s) during which Defendant made the telephone calls;
- The telephone numbers to which Defendant made telephone calls;
- The telephone numbers for which Defendant had prior express written consent;
- The purposes of such telephone calls; and
- The names and addresses of Class members.

225. The Classes are comprised of hundreds, if not thousands, of individuals.

226. There are common questions of law and fact affecting the rights of the Members of the Classes, including, *inter alia*, the following:

- Whether Defendant makes telemarketing calls;
- Whether Defendant obtains prior express written consent;
- Whether Defendant makes solicitation calls and to telephone numbers registered on the National Do-Not-Call Registry;
- Whether Defendant had the required policies and procedures prior to making telemarketing calls;
- Whether Defendant's statutory violations were willful and knowing; and
- Whether Defendant should be enjoined from engaging in such conduct in the future.

227. Plaintiff is a member of the Classes in that Defendant placed two or more calls for telemarketing purposes, in a one-year period to her telephone number, without her prior express written consent, and while her telephone number was on the National Do-Not-Call Registry.

228. Plaintiff's claims are typical of the claims of the Members of the Classes in that they arise from Defendant's uniform conduct and are based on the same legal theories as these claims.

229. Plaintiff and all putative Members of the Classes have also necessarily suffered concrete harm in addition to statutory damages, as all Members of the Classes spent time tending to Defendant's unwanted calls and suffered a nuisance and an invasion of their privacy.

230. Plaintiff has no interests antagonistic to, or in conflict with, the Classes.

231. Plaintiff will thoroughly and adequately protect the interests of the Classes, having retained qualified and competent legal counsel to represent her and the Classes.

232. Defendant has acted and refused to act on grounds generally applicable to the Classes, thereby making injunctive and declaratory relief appropriate for the Classes.

233. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications.

234. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since, *inter alia*, the damages suffered by each class member make individual actions uneconomical.

235. Common questions will predominate, and there will be no unusual manageability issues.

**FIRST CAUSE OF ACTION AGAINST BOTH DEFENDANTS**
**Violations of the TCPA, 47 U.S.C. § 227(c)**
**(On Behalf of Plaintiff and the Registry Class)**

236. Plaintiff and the proposed Registry Class incorporate the allegations of paragraphs 1-191 as if fully set forth herein.

237. Defendant made telephone solicitations to Plaintiff's and putative Registry Class Members' telephone numbers.

238. Plaintiff's and putative Registry Class Members' telephone numbers were all on the National Do-Not-Call Registry at the time of the calls.

239. Plaintiff and putative Registry Class Members each received two or more such calls in a 12-month period.

240. Plaintiff and putative Registry Class Members are entitled to an award of $500 in statutory damages for each telephone solicitation call pursuant to 47 U.S.C. § 227(c)(5).

241. Plaintiff and putative Registry Class Members are entitled to an award of treble damages in an amount up to $1,500 for each telephone solicitation call made knowingly and/or willfully, pursuant to 47 U.S.C. § 227(c)(5).

WHEREFORE, Plaintiff respectfully request that the Court grant Plaintiff and the Classes relief against Defendants, individually and jointly, as set forth in the Prayer for Relief below.

**SECOND CAUSE OF ACTION AGAINST BOTH DEFENDANTS**
**Violations of the TCPA, 47 U.S.C. § 227(c)**
**(On behalf of Plaintiff and the Policy Class)**

242. Plaintiff and the proposed Policy Class incorporate the allegations of paragraphs 1-191 as if fully set forth herein.

243. Defendants made numerous telephone calls for telemarketing purposes to Plaintiff's and putative Policy Class Members' telephone numbers.

244. Defendants did so despite not having a written policy as required by the TCPA.

245. Defendants misrepresented their identities to conceal the illegal conduct.

246. Defendants did so despite not training their personnel on the TCPA's identification requirements.

247. Defendants made two or more telemarketing calls to Plaintiff and putative Policy Class Members' telephone numbers in a 12-month period.

248. Plaintiff and putative Policy Class Members are entitled to an award of $500 in statutory damages telephone call pursuant to 47 U.S.C. § 227(c)(5).

249. Plaintiff and putative Policy Class Members are entitled to an award of treble damages in an amount up to $1,500 telephone call, pursuant to 47 U.S.C. § 227(c)(5).

WHEREFORE, Plaintiff respectfully request that the Court grant Plaintiff and the Classes relief against Defendants, individually and jointly, as set forth in the Prayer for Relief below

**THIRD CAUSE OF ACTION AGAINST BOTH DEFENDANTS**
**Violations of Texas Business and Commerce Code, Chapter 305**
**(On Behalf of Plaintiff and the Texas Class)**

250. Plaintiff and the proposed Texas Class incorporate the allegations of paragraphs 1-191 as if fully set forth herein.

251. Plaintiff is a "person" as defined by Texas Business & Commerce Code § 1-201(b)(27).

252. Coverage One is a "person" as defined by Texas Business & Commerce Code § 1-201(b)(27).

253. Ettinger is a "person" as defined by Texas Business & Commerce Code § 1-201(b)(27).

254. Pursuant to Section 305-053(a) of the Texas Business & Commerce Code, a person who receives a communication that violates 47 U.S.C. § 227, or a regulation adopted under that provision, may bring an action against the person who originates the communication for an injunction, damages or both an injunction and damages.

255. As set forth above Defendants violated 47 U.S.C. § 227, or a regulation adopted under that provision.

256. Plaintiff is entitled to a permanent injunction to prevent any further violations of the Texas Business & Commerce Code, Chapter 305.

257. Pursuant to Section 305-053(b) of the Texas Business & Commerce Code, Plaintiff is entitled to the greater of $500.00 for each violation or Plaintiff's actual damages for each call negligently made by Defendants.

258. Pursuant to Section 305-053(c) of the Texas Business & Commerce Code, Plaintiff is entitled to not more than the greater of $1,500.00 for each violation or three times Plaintiff's actual damages for each violation by Defendants that the Court finds was made knowingly or intentionally.

WHEREFORE, Plaintiff respectfully request that the Court grant Plaintiff and the Classes relief against Defendants, individually and jointly, as set forth in the Prayer for Relief below

**FOURTH CAUSE OF ACTION AGAINST COVERAGE ONE - Violations of Texas Business and Commerce Code, § 302.101 (On Behalf of Plaintiff and the Texas Registration Class)**

259. Plaintiff and the proposed Texas Registration Class incorporate the allegations of paragraphs 1-191 as if fully set forth herein.

260. Plaintiff is a "consumer" as defined by § 301.001(2) of the Texas Business & Commerce Code.

261. Defendant Coverage One is a "telephone solicitor" as defined by § 301.001(5)) of the Texas Business & Commerce Code.

262. Defendant Coverage One attempted to sell insurance products and services to consumers.

263. No exemptions to the registration requirements apply. Coverage One is not licensed under the Texas Insurance Code. The "licensed agents" involved in the calls to Plaintiff and the Class Members were licensed in Florida not Texas.

264. §302.101 of the Texas Business & Commerce Code prohibits sellers from

engaging in telephone solicitation from a location in Texas or to a purchaser located in Texas unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

265. Sellers engaging in telephone solicitations are required to register, among other things, list "each telephone number to be used by the seller and the address where each telephone using the number is located." §302.151(10).

266. Defendant Coverage One has failed to register pursuant to § 302.101 of the Texas Business & Commercial Code to provide telephone solicitations.

267. Defendant Coverage One placed telephone solicitations to Plaintiff's and the Texas Registration Class Members' telephone numbers while Defendant Coverage One did not hold a registration certificate.

268. Defendant Coverage One's telephone solicitations were made from a location in Texas or to Plaintiff and the Texas Registration Class Members located in Texas.

269. Plaintiff and the Texas Registration Class Members are entitled to an award of up to $5,000 for each violation and all reasonable cost of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorney's fees.

WHEREFORE, Plaintiff respectfully request that the Court grant Plaintiff and the Classes relief against Defendant, Coverage One, as set forth in the Prayer for Relief below

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

A. An order certifying the Classes as defined above, appointing Plaintiff as the representatives of the Classes and appointing her counsel as Class Counsel;

B. An order declaring that Defendants' actions, as set out above, violate the statutes referenced herein;

C. An award of injunctive and other equitable relief as necessary to protect the interests of the Classes, including, *inter alia*, an order prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

D. An award of statutory damages;

E. An award of treble damages;

F. An award of reasonable attorneys' fees and costs, including the costs set forth pursuant to Tex. Bus. & Com. Code § 302.302(d); and

G. Such other and further relief that the Court deems reasonable and just.

**Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all triable issues.

Dated: April 9, 2026.

By: /s/ *Joshua H. Eggnatz*
Joshua H. Eggnatz, Esq.
Fla. Bar. No.: 0067926
**EGGNATZ | PASCUCCI**
7450 Griffin Road, Suite 230
Davie, FL 33314
Tel: (954) 889-3359
Fax: (954) 889-5913
JEggnatz@JusticeEarned.com
SGizzie@JusticeEarned.com

*Local counsel for Plaintiff and the proposed classes*

Chris R. Miltenberger, Esq.
Texas State Bar Number 14171200
**LAW OFFICE OF CHRIS R. MILTENBERGER, PLLC**
1360 N. White Chapel Blvd., Suite 200
Southlake, Texas 76092

Tel: (817) 416-5060
Fax: (817) 416-5062
chris@crmlawpractice.com

*Counsel for Plaintiff and the proposed classes*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 09, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

*/s/ Joshua H. Eggnatz*
Joshua H. Eggnatz